

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-23-2005

# USA v. Tirado

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-3370

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Tirado" (2005). *2005 Decisions.* Paper 1147.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1147

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 04-3370

UNITED STATES OF AMERICA

v.

ANTONIO M. TIRADO,
Appellant

———————————

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No.: 04-cr-0004E
District Judge: The Honorable Sean J. McLaughlin

———————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 6, 2005

———————————

Before: McKEE, SMITH, and VAN ANTWERPEN, *Circuit Judges*

(Filed: May 23, 2005)

———————————

OPINION

———————————

SMITH, *Circuit Judge.*

Antonio M. Tirado, who was convicted of violating 18 U.S.C. §922(g)(1),

challenges the warrantless search of his apartment, which was precipitated by a tip given

to Tirado's parole officer by another parolee. A .38 caliber handgun was discovered

during the search, the possession of which by a felon was a violation of 18 U.S.C. § 922(g)(1).[1] A jury found Tirado guilty and the District Court sentenced him to 120 months of incarceration. We will affirm the denial of Tirado's motion to suppress, but will remand the case for resentencing in accordance with *United States v. Booker*, 543 U.S. __, 125 S. Ct. 738 (2005).

**Factual Background**

Parolee Antonio M. Tirado was a convicted felon who came under the supervision of Pennsylvania Board of Probation and Parole (PBPP) Agent Vanessa Norton-Booker in September 2003. Among the conditions of Tirado's parole were that he not use, possess, or sell controlled substances, or own or possess firearms. In the six weeks Tirado was under Norton-Booker's supervision, the agent received repeated phone tips from an anonymous woman that Tirado was selling drugs. Tirado denied the allegations when confronted by Norton-Booker. Over the six weeks, Tirado had tested positive for marijuana three times, indicating that he had used the drug at least twice.[2] After Tirado's third positive test for marijuana on October 24, 2003, Norton-Booker and her supervisor

---

[1] Tirado also challenges the enactment of § 922(g)(1) by Congress as exceeding its authority under the Commerce Clause. Tirado concedes that this Court rejected a facial challenge to § 922 (g) in *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001). He continues to raise this issue to preserve it for further appellate review. *Singletary* is binding precedent, and we will not discuss the constitutionality of § 922(g). *See* Third Circuit IOP 9.1.

[2] Because Tirado's THC count was lower in his third positive test than in his second positive test, it is uncertain whether Tirado had used marijuana in the interim between the two tests.

determined that they would arrest Tirado, but they had not set a date for effecting the arrest.

On October 29, 2003, another of Norton-Booker's parolees, who had been avoiding the agent and who had been declared delinquent, surrendered himself to her. This unnamed parolee, who appeared with and was urged on by his girlfriend, admitted to having used crack cocaine that day. The parolee stated that having to dodge Norton-Booker made his crack habit not worth the bother, and that he wanted to return to prison to serve the rest of his sentence. By doing so, the parolee reasoned he could live "off paper," i.e. without PBPP supervision, upon his release and resume his drug habit in relative peace.

At the "stern request" of his girlfriend, the informant, who initially did not want to give Norton-Booker the information, divulged that his drug supplier was also one of Norton-Booker's parolees, "Poopie" Tirado. Norton-Booker recognized "Poopie" Tirado as Antonio Tirado. The informant reported that he had traded his girlfriend's living room and bedroom furniture to Tirado for drugs while the girlfriend worked, and it appears that the "highly upset" girlfriend's wish to retrieve her furniture was the motivating factor behind the informant's fingering of Tirado. Upon further questioning by Norton-Booker, the informant stated that he had also traded a handgun to Tirado for drugs.

Upon hearing of the gun, Norton-Booker, who had been on the job less than a year, summoned PBPP Agent William Wehrle to continue the interview with the informant.

Wehrle had thirty-two year's experience and a greater knowledge of firearms. The informant told Wehrle that he had traded a gun to Tirado for drugs approximately a week and a half earlier and that the informant had seen Tirado carrying another handgun. The informant described where Tirado lived, knew that Tirado had recently moved to that apartment to live with a girlfriend, and gave Wehrle the telephone number he had used to contact Tirado at the residence to arrange drug purchases. The informant was arrested and returned to prison that day. The informant's statements were not part of any bargain.

After interviewing the informant, Wehrle checked the informant's statements concerning Tirado's living situation with Norton-Booker, and confirmed that the description of the residence given by the informant matched the address Norton-Booker had for Tirado by driving past the building. Wehrle also reviewed Tirado's file and noted that Tirado's criminal history was consistent with the accusations of the informant. Wehrle did not, however, check the telephone number the informant had provided for Tirado or review the informant's file to assess his reliability. Confident that he had the requisite reasonable suspicion to search Tirado's residence for drugs and guns,[3] Wehrle, consistent with PBPP policy, received approval from his supervisor to conduct a warrantless search of Tirado's residence.

Agents Norton-Booker and Wehrle searched Tirado's residence later that day, and

_____

[3] Tirado had signed Pennsylvania's standard consent to search form, about which this Court has predicted the Pennsylvania Supreme Court would construe as including "an implicit requirement that any search be based on reasonable suspicion." *United States v. Baker*, 221 F.3d 438, 448 (3d Cir. 2000).

found a .38 caliber handgun behind the ceiling tiles in the living room. Tirado was arrested, tried for and convicted of being a felon in possession of a firearm, and was sentenced to 120 months' incarceration.

**District Court Order**

On May 6, 2004, following a hearing at which Agents Norton-Booker and Wehrle testified, the District Court issued an order from the bench denying Tirado's motion to suppress. The District Court "credit[ed] the testimony of Agent Booker in all respects," but noted that Norton-Booker had made an error in recalling the description of the firearm the informant exchanged for drugs. On this point, the District Court found Agent Wehrle's recollection "much clearer." The District Court also found credible Agent Wehrle's testimony that the informant told Wehrle that Tirado had given drugs to the informant in exchange for a firearm.

The District Court observed that "it is now well-settled that the home of a parolee or probationer may be searched without a warrant whenever the parole or probation officer reasonably believes that it is necessary in the performance of their duties to search the house based on reasonable suspicion." *Citing Griffin v. Wisconsin*, 483 U.S. 868, 871-72 (1987); *United States v. Hill*, 967 F.2d 902, 910 (3d Cir. 1992); *United States v. Baker*, 221 F.3d 438 (3d Cir. 2000).

The District Court found substantial evidence to support a reasonable suspicion for the search because the informant (1) was known to the agents; (2) would face adverse

consequences had he lied about Tirado's illegal behavior; (3) had firsthand knowledge; and (4) related specific information that lent credence to the conclusion that he had witnessed Tirado's parole violations.

**Analysis**

The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291. "This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 316 (3d Cir. 2002).

In *Griffin*, the Supreme Court held that the state's interest in supervising probationers raised a "special need" justifying an exception to the Fourth Amendment's requirement that searches be conducted pursuant to a warrant supported by probable cause. 438 U.S. at 873. The Wisconsin regulation at issue mirrored the Pennsylvania regulation implicated here – it allowed any probation officer to conduct a warrantless search of a probationers' residence so long as the officer had his supervisor's approval and "reasonable grounds" to believe the residence contained items the probationer was prohibited from possessing. *Id.* at 870. The Court found the search of the probationer's residence reasonable under the Fourth Amendment "because it was conducted pursuant to a valid regulation governing probationers." *Id.* at 880.

In *Hill*, this Court determined that *Griffin's* "special needs" reasoning applied

equally to parolees. 967 F.2d at 909. Though there was no regulatory provision authorizing warrantless searches as a parole condition, nor had the parolee expressly agreed to such a condition, this Court upheld the search of the parolee's convenience store based on his wife's report that he had stored guns and drugs there. *Id.* at 908, 911. Then, in *Baker*, upon the Pennsylvania Supreme Court's denial of this Court's petition for certification on the question, we reasoned from analogous state case law that where a parolee had signed PBPP's standard consent-to-search form (as Tirado had), warrantless searches of a parolee's residence by PBPP agents must be based on reasonable suspicion that evidence of a parole violation would be found there. 221 F.3d at 449.

Given the uncontroverted fact that Agents Norton-Booker and Wehrle received supervisory approval to conduct a warrantless search Tirado's residence in accordance with the PBPP regulation, the District Court properly framed the issue in this case to be whether the search of Tirado's residence was supported by reasonable suspicion. As an initial matter, we note that Tirado's positive drug tests and the anonymous phone tips stating that he was selling illegal narcotics may have given Norton-Booker enough reasonable suspicion to conduct an administrative search of Tirado's residence before the informant even appeared in Norton-Booker's office on October 29, 2003. Indeed, a positive drug test alone has been held to be reasonable suspicion to support a search of a probationer's residence. *United States v. Hubbard*, 269 F. Supp. 2d 474, 478 (D. Del. 2003).

In the thirty-six years since the seminal case of *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court has repeatedly taught that reasonable suspicion determinations "must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000); *see United States v. Cortez*, 449 U.S. 411, 418 (1981). Though courts have fleshed out the probative value of tips in the typical circumstances of anonymous tipsters, known persons informing for the first time, or repeat tipsters whose past reliability is known; and tips from concerned citizens uninterested in personal gain and from those who seek monetary rewards or favorable deals from prosecutors, the commonsense approach is sufficiently malleable to guide our inquiry in the seemingly unique situation here, where a known informant has a prison wish and an irate girlfriend seeking the return of her property from the informant's supplier. In short, the commonsense framework holds that where an informant's tip weighs in the totality-of-the-circumstances analysis, courts must determine whether the tip is credible, reliable, and has a solid basis of knowledge. *See Alabama v. White*, 496 U.S. 325, 328 (1990).

Tirado attacks the credibility of the tip by noting that the source was a drug-addicted parole violator who may have been under the influence of crack cocaine at the time he implicated Tirado as his supplier. Tirado also questions the reliability of the information by observing that it came from a first-time informant and by arguing that the PBPP agents inadequately corroborated the tip.

Recognizing that the totality of the circumstances inquiry is a compensating mechanism in which a deficit in one area can be overcome by a strong showing in another, *see id.* at 330, and, as suggested above, realizing that the informant did not have to add much if anything for the PBPP agents to attain the reasonable suspicion necessary to conduct a warrantless search of Tirado's house, we do not view this as a particularly close case. *See id.* ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").

Though Tirado rightly points out that the informant had no history of providing tips to Norton-Booker, meaning the reliability of this tip could not be judged by past performance, and though the PBPP agents did not do as much as they could have to corroborate the tip, the deficit of reliability here is offset by a strong showing of credibility and the informant's firsthand knowledge.

*First*, Agent Wehrle independently corroborated some of the informant's tip, bolstering its reliability. *See Gates,* 462 U.S. at 241 ("Our decisions applying the totality-of-the-circumstances analysis outlined above have consistently recognized the value of corroboration of details of an informant's tip by independent police work."). Wehrle matched the informant's description of the location of Tirado's residence with the latest

9

address Norton-Booker had for Tirado, and Wehrle conducted a drive-by surveillance of the building to assure the match. Wehrle corroborated with Norton-Booker the informant's statement that Tirado had recently moved in with a girlfriend, which supported the informant's claim that he had recently been in Tirado's residence. Also, Wehrle reviewed Tirado's file, and ascertained that Tirado's past involvement in criminality – which included drug and assault convictions – roughly matched the informant's accusations of Tirado's lawbreaking while on parole.

*Second,* despite the informant's statement that he had ingested crack cocaine earlier in the day, suggesting that he was either under its influence at the time of his interview or suffering withdrawal, the circumstances under which his statements were made lend credibility to them. The emotionality exhibited by the informant with which Tirado attempts to undermine his statements did not reveal an inherent untrustworthiness of the information as much as it reflected the informant's realization of the wretched depths of his depravity. The informant was reluctant to inform on Tirado. He sought nothing in exchange for the information, and thus had no reason to lie. Further, we can conceive of no greater indicia of credibility than the absurd facts of this real life tragicomedy – that of an informant shamed by his partner to divulge with whom the informant had traded the partner's belongings for drugs while the partner was at work. In this scenario, the gun-for-drugs trade and the informant's sighting of Tirado with a second prohibited weapon seemed like a secondary consideration to the informant, if not

10

the PBPP agents. Everyday experience advises that one is less likely to lie about a matter they consider relatively unimportant, thus the informant's statements about Tirado's gun possession were credible.

*Third*, the informant's knowledge of Tirado's drug and gun possession was firsthand. *See Gates*, 462 U.S. at 234 (stating that the informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand entitles the tip to greater weight than might otherwise be the case"). The informant received drugs from Tirado in exchange for furniture on at least one occasion and in exchange for a gun on another. The informant also averred that he saw Tirado with a second gun, one Tirado "generally carried." The informant's participation in and personal observation of Tirado's parole violations significantly support the conclusion that it was reasonable for the PBPP agents to suspect that Tirado had drugs and guns in his residence.

In light of the anonymous tip that Tirado was selling illegal narcotics, and Tirado's positive drug tests before October 29, 2003, even were the informant's statements that Tirado possessed drugs and guns of modest overall reliability, they would have been enough of an addition to the totality of the circumstances calculus to support a search of Tirado's residence pursuant to the reasonable suspicion standard. As it is, the circumstances of the informant's interview lent credibility to his statements, and, when coupled with his firsthand knowledge, easily overcame any deficiency related to the fact

11

that the informant had no established track record of giving law enforcement accurate tips and that the PBPP agents' corroboration of the informant's statements was somewhat cursory. For these reasons, we will affirm the District Court's denial of Tirado's motion to suppress.

**Tirado's Sentence**

In response to this Court's March 9, 2005, "*Booker* order," Tirado argues that judicial fact finding and the concomitant increases in his sentence were precluded under *Blakely v. Washington*, 542 U.S. __, 124 S.Ct. 2531 (2004). On *Blakely*'s heels, the Supreme Court decided *United States v. Booker*, 543 U.S. __, 125 S.Ct. 738 (2005). There, the Supreme Court determined that the Guidelines were only advisory, not mandatory.

Having determined that the sentencing issues Tirado raises are best determined by the District Court in the first instance, we will vacate the sentence and remand for resentencing in accordance with *Booker*.